STATE OF MAINE                                      SUPERIOR COURT
CUMBERLAND, ss                                      CIVIL ACTION
                                                    DOCKET NO. CV-18-75


HILDA GLADSTONE,

        Plaintiff

v.                                                  ORDER


MATTHEW GLADSTONE,

        Defendant


        In this action plaintiff Hilda Gladstone (Hilda) is suing her son Matthew Gladstone

(Matthew) because of numerous disputes between them over real property at 111

Mountfort Road in North Yarmouth.

        The parties agree that the property originally belonged to Hilda's late husband

Lionel, who died in 2012, bequeathing a life estate to Hilda and the remainder interest to

Matthew. Hilda specifically argues that she was unlawfully ousted from the property by

Matthew in November 2015 and that when she regained access to the property in

November 2017, Matthew spitefully left the property in a damaged condition. Hilda seeks

damages under various theories and also alleges that because she repurchased the

property in 2018 after the Town of North Yarmouth had foreclosed on unpaid tax liens, she

now owns the property in fee simple.

        A jury-waived trial was held on February 27 and March 21, 2019, and the parties

subsequently filed post-trial briefs.

        Having heard the evidence and having evaluated the credibility of the testimony

presented, the court makes the following findings of fact and conclusions of law:


**Plaintiff–Thaddeus Day, Esq.**
**Defendant–David Lourie, Esq.**

REC⋯ CUMB CLERKS OFC
AUG 9 '19 PM 1:57

1. Lionel Gladstone died in 2012. In his will he left a life estate in the real property at 111 Mountfort Road, North Yarmouth, to his wife Hilda and the remainder interest in that property to Hilda's son Matthew, whom he had adopted after he married Hilda.

2. The premises in question consisted of the lot, a residence that include an addition built by Lionel, and two garages – one of which was a four-bay garage that the parties referred to as the Bonanza garage.

3. After Lionel's death Matthew was living with his mother, but their relationship eventually deteriorated into open hostility, particularly after Matthew began a relationship with Christina York in late 2014 or early 2015. Sometime in approximately February 2015, Matthew began spending nights with Ms. York at her family's house but was occupying the garages at 111 Mountfort Road to conduct a business of repairing cars.

4. There were several areas of friction between Hilda and Matthew. One was that Hilda felt that Matthew was neglecting her.

5. Another was financial. During this time period Hilda was falling behind on paying the real estate taxes. Although those were her responsibility as the life tenant,[1] Matthew was using the property to conduct his business. Asked to contribute to the property taxes, he made only a small payment in June 2015.[2] He declined to pay more and also did not offer any meaningful help with Hilda's other expenses (heating oil and utilities).

6. The friction intensified because Matthew acted as if he had an absolute right to use the garages and the premises at 111 Mountfort Road (other than the residence), coming and going as he pleased, notwithstanding Hilda's life estate.

---

[1] *Varney v. Stevens*, 22 Me. 331, 334 (1843).

7. As the friction continued, Matthew became verbally abusive to Hilda, telling her on one occasion, "If you don't like it, get the fuck out" and making similar statements on other occasions. This was substantiated by the testimony of Tammy Russell.

8. Hilda sought the assistance of law enforcement to have Matthew barred from the premises, but the law enforcement officers who came to the residence apparently concluded that Matthew had an equal claim to the property. Because Hilda cannot read and is not articulate, she was at a significant disadvantage in attempting to assert her rights.

9. On at least one occasion Matthew pushed Hilda against a wall. Hilda was reluctant to tell anyone about this incident "because he was my son."

10. Afraid of what Matthew might do, Hilda decided to leave the property early in November 2015. When Matthew realized she had left and was making several trips to move out, he felled a tree across the driveway and would not even let her return to retrieve certain of her belongings, stating that she had abandoned the property. He thereafter installed a gate at the end of the driveway.

11. When Hilda left, she called CMP to disconnect the electrical service in her name. Although Matthew emphasizes this point in his argument that Hilda had abandoned the property, he was at the property virtually every day and was present on the property before she had finished moving out. Since Matthew was responsible for forcing her off the property, Hilda was not obliged to pay for Matthew's utilities.

12. As the life tenant, Hilda was entitled to "the management, possession and control of the estate." *Abbott v. Danforth*, 135 Me. 172, 176, 192 A. 544, 546 (1937) (quoted

---

[2] The property tax bill listed the owners of the property as Matthew and Hilda Gladstone.

3

recently in *Estate of Frye v. MMG Ins. Co.*, 2018 ME 44 ¶ 13, 182 A.3d 158). Matthew's actions forced her to leave the premises and denied her access to the property after she left. This constituted tortious interference with Hilda's enjoyment of her life estate for which Hilda is entitled to recover damages. *See Estate of Hodgkins*, 2002 ME 154 ¶16, 807 A.2d 626.

13. In *Estate of Hodgkins*, the Law Court affirmed the award of damages against a remainderman who had interfered with the life tenant's possession in a similar manner to Matthew's interference in this case. The Law Court found that the life tenant was entitled to damages for the loss of use of the property during the period when she had been forced out of the property and any associated damages reasonably flowing from the remainderman's actions. 2002 ME 154 ¶ 16.

14. Hilda was required to pay a total of $12,000 in rent for another residence for the two years in which she was excluded from the property, and she is entitled to recover that amount from Matthew.

15. Hilda argues that as the life tenant, she should be entitled to rent for the two years when Matthew was in possession of the premises. This would appear to be consistent with damages for "loss of use" under *Estate of Hodgkins*, 2002 ME 154 ¶ 16. However, the primary evidence Hilda offered as to the rental value of the property were calculations by the U.S. Department of Housing and Urban Development of a "Fair Market Rent" in 2015, 2016, and 2017 applicable to one, two, three, and four bedroom units within the Greater Portland Metro FMR Area – an area that comprises some 23 towns including Old Orchard Beach, Scarborough, Cape Elizabeth, Falmouth, Yarmouth, Freeport, North Yarmouth, Windham, and Portland itself. This information is far too general to allow the

court to arrive at a fair rental value for the specific residence at 111 Mountfort Road in North Yarmouth. Based on the description of the property, the court does not find Hilda would be entitled to the average rental for properties within the Greater Portland area – even if it were to agree that HUD's methodology in determining average rental values for the metropolitan area was relatively accurate.

16. The court will, however, determine that Hilda is entitled to what the court would consider to be a bare minimum rental – for the garages alone, which Matthew used for a business purpose – of $200 per month ($4,800 total).

17. Hilda also seeks to recover the rental value for Matthew's occupancy of the property on a claim for unjust enrichment. In order to prevail on a claim for unjust enrichment, she would have to prove (1) that she conferred a benefit on Matthew, (2) that Matthew had appreciation or knowledge of the benefit, and (3) that the circumstances would make it inequitable for Matthew to retain the benefit without payment of its value. *E.g., Estate of Anderson,* 2010 ME 10 ¶ 10, 988 A.2d 977. The court does not have to determine whether the facts support an unjust enrichment claim in this case because, as set forth above, the court has already awarded damages for rental value.

18. Hilda ultimately was able to regain the premises early in November 2017 but only after obtaining counsel, serving a 30-day notice to vacate the premises, and bringing an action for forcible entry and detainer when Matthew did not comply. At the hearing on October 5, 2017 in the FED action, Matthew agreed that he would vacate the premises by October 30, but he did not leave until required to vacate on November 4, 2017 – after a writ of possession had been obtained and the sheriff's office came to the premises to enforce the

5

writ. On that date Matthew moved various possessions off of the premises by transporting them in the bucket of a front-end loader, making some four trips down the driveway.

19. Costs are not available as part of a forcible entry and detainer action, and Hilda is therefore entitled to recover $ 286.28 she incurred in filing and service fees in the Fed action and for obtaining the writ of possession. Hilda is also seeking the attorney's fees she incurred in the FED action. While attorney's fees may sometimes be recovered when a party has been obliged to incur such fees by the tort of another, they are only available for attorney's fees incurred in litigation between a plaintiff and a third party. *Gagnon v. Turgeon*, 271 A.2d 634, 635-36 (Me. 1970).

20. Although Hilda left her residence in a somewhat cluttered condition when Matthew took possession, Matthew engaged in various actions to damage the premises before he left. This was occasioned by his anger about the outcome of the FED proceeding and his resentment of Hilda.

21. Specifically Matthew angrily broke the glass panes on a hutch belonging to Hilda and gouged two holes in the sheetrock (Plaintiff's Exs. 39 and 40). Matthew also left the premises in disarray, leaving extensive debris and rubbish, including dirty diapers, empty food cartons, and rotting food, in some of the rooms of the residence. The photographs offered by plaintiff demonstrated that many of the rooms were strewn with trash.

22. The condition of the premises when Hilda repossessed the property in November 2017 was considerably worse than its condition when Matthew took possession in November 2015. While some of this can be attributed to Matthew's actions in response to the FED action and the writ of possession, some appears to have resulted from damage caused to the premises during Matthew's time in possession.

6

23. For instance, a garage door in the Bonanza garage was buckled and had been smashed outward (Plaintiff's Ex. 10), most likely by Matthew's front end loader. there was evidence that assorted junk, including some heavy items, left in that garage had been pushed up against the back wall (Plaintiff's Ex.12).

24. Inside the house on the day Matthew moved out there were rooms with a strong smell of urine, apparently from a cat or dog belonging to Matthew. The dishwasher was actively leaking and the hose to it had to be shut off. There were also some broken windows and other damage, including damage to a corner of the roof of the Bonanza garage, that had occurred at some point during Matthew's possession of the property.

25. With the help of another of her sons and several friends, Hilda's house was cleaned up and the trash removed. This took a number of days, but the persons who assisted Hilda in cleaning up did so without expecting payment from Hilda, and Hilda cannot recover damages from Matthew for services she received without charge. *See Faulkingham v. Seacoast Subaru, Inc.*, 619 A.2d 987, 988 (Me. 1993) ("Allowing Faulkingham to recover the cost of repairs successfully made at no cost to her would afford her an unjustifiable windfall.").

26. Hilda's residence is now generally clean and orderly. However, repairs to the damaged sheetrock, the hutch, broken windows, and the Bonanza garage have not been done. No reliable evidence was offered as to what those repairs would cost.

27. Hilda did offer evidence of a small repair expense that she incurred, and she is entitled to recover that amount ($140.00) from Matthew.

28. When Hilda left the property in 2015, there was a 2003 Crown Victoria automobile and a 2007 Crown Victoria automobile on the property. The 2003 belonged to

7

Hilda. The 2007 belonged to James Moulton. Moulton attempted to reclaim his vehicle but was not permitted to do so by Matthew.

29. Those vehicles were cut up and scrapped by Matthew and were no longer on the property when Hilda regained possession.

30. There is a dispute as to the value of those vehicles, and it is doubtful either vehicle was roadworthy as of November 2015, when Hilda left the property. Moreover, although both Moulton and Hilda expressed the view at trial that Hilda was responsible to Moulton for the loss of his vehicle, the court concludes that the vehicle was scrapped by Matthew when Matthew was in possession of the property. If anyone is liable to Moulton for the value of the vehicle, it is Matthew, not Hilda. Moulton is not a named plaintiff in this action, and the court therefore cannot award Moulton damages against Matthew for the loss of his vehicle.

31. The court concludes that the value of Hilda's vehicle as of the date that Matthew wrongfully assumed possession of that vehicle was $1,000, and assesses damages in that amount against Matthew.

32. Hilda also made a claim for the value of some firewood that Matthew removed from the property. There was a dispute at trial as to whether that firewood belonged to Hilda, but the court does not have to decide that issue because no evidence was offered as to the value of the firewood.

33. The remaining issue relates to the status of title to the property after the Town of North Yarmouth foreclosed on the property based on unpaid real estate taxes and Hilda then obtained a quitclaim deed from the Town after paying $ 14,672.68 in back taxes on

8

May 17, 2017.[3] It appears that roughly half of the unpaid taxes accrued during the time that Matthew was in possession of the property, and the remainder had accrued prior to that date.

34. Although Hilda's complaint seeks a declaratory judgment that she is now the owner in fee simple by reason of her purchase of the property from the town, she is not entitled to that relief. This follows from 36 M.R.S. § 943, which provides in pertinent part that when a municipality conveys the property back to a former record titleholder for consideration of the taxes due, "the rights of other parties claiming an interest of record in the premises at the time of foreclosure . . . are revived as if the tax lien mortgage had not been foreclosed."

35. Accordingly, Matthew is entitled to a declaratory judgment sought in his counterclaim that the foreclosure of the tax lien mortgage and the Town's conveyance of the property to Hilda when she paid the back taxes did not extinguish Matthew's remainder interest in the property upon the termination of Hilda's life estate.

36. Matthew also brought a counterclaim against Hilda seeking injunctive relief requiring that Hilda pay future property taxes and protect his remainder interest as long as she remains in the property. Based on this record, Matthew has not made the necessary showing for any award of injunctive relief. Matthew argues that his remainder interest could be jeopardized if Hilda is unable to pay future property taxes. If that occurs, it will be because Hilda does not possess the necessary financial resources. A court cannot order Hilda to pay money that she does not have.

---

[3] Hilda testified that she borrowed that money from an acquaintance named Herbert Cail and hopes to repay him for that loan.

37. Matthew also asserted a counterclaim for alleged conversion of certain of his property by Hilda but he offered no evidence to support that claim at trial.

The entry shall be:

1. Judgment is entered in favor of plaintiff Hilda Gladstone and against defendant Matthew Gladstone in the amount of $17,086.28 on Hilda's claim for tortious interference with her life estate in count IV of the complaint.

3. Judgment is entered in favor of plaintiff and against defendant in the amount of $140.00 on count II of the complaint (damage to property).

4. Judgment is entered in favor of plaintiff and against defendant in the amount of $1,000.00 on count III of the complaint (conversion).

5. Judgment is entered against plaintiff on count I of her complaint and is entered in favor of defendant on defendant's counterclaim for a declaratory judgment that plaintiff's repurchase of the premises after a tax foreclosure does not extinguish defendant's remainder interest upon the termination of plaintiff's life estate.

6. Judgment is entered against plaintiff and in favor of defendant on count V of the complaint.

7. Judgment is entered against defendant and in favor of plaintiff on defendant's counterclaim for injunctive relief and his counterclaim for conversion.

8. Plaintiff is entitled to prejudgment interest on the total damages awarded of $18,226.28 from February 22, 2018 to the entry of judgment at 4.76 %. Post-judgment interest shall run at 8.59 %. Plaintiff may submit a bill of costs.

9. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: August __6__, 2019

Thomas D. Warren
Justice, Superior Court

mc/

Entered on the Docket: 08/14/19

10